# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| POLARIS INDUSTRIES, INC., | Civil Nos. 15-4129, 15-4475 (JRT/TNL) |
| Plaintiff, | |
| v. | |
| | **ORDER** |
| ARCTIC CAT INC., and ARCTIC CAT SALES INC., | |
| Defendants. | |

Alan G. Carlson, Dennis C. Bremer, Nathan Louwagie, Peter Kohlhepp, Samuel T. Lockner, **CARLSON CASPERS VANDENBURGH LINDQUIST & SCHUMAN PA**, 225 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for plaintiff.

Joseph Herriges, John C. Adkisson, Conrad A. Gosen, Jason M. Zucchi, Maria Elena Stiteler, **FISH & RICHARDSON**, 60 South Sixth Street, 3200 RBC Plaza, Minneapolis, MN 55402, for defendants.

Plaintiff Polaris Industries, Inc. ("Polaris") brings these patent-infringement actions against defendants Arctic Cat Inc. and Arctic Cat Sales Inc. (collectively "Arctic Cat"). Both parties moved for summary judgment on various issues, and Arctic Cat moved to exclude Polaris expert Timothy J. Nantell's opinion on lost profits. The Court will deny Polaris's Motion for Partial Summary Judgment regarding Arctic Cat's invalidity defense based on the Kymco vehicle, and Arctic Cat's motions for Summary Judgment of no lost profits of the '501 Patent and to Exclude Expert Testimony of Timothy J. Nantell. The Court will grant Polaris's motion for Summary Judgment of infringement of the '501 Patent, and Arctic Cat's motion for Summary Judgment of noninfringement of the '449 Patent.

# BACKGROUND

This series of patent cases arises from the entry of Arctic Cat into the market for 4x4 Trail Recreational Off-Road Vehicles ("4x4 Trail ROV"). Prior to 2013, Polaris had a 90% market share in the 4x4 Trail ROV market. *Polaris Indus. Inc. v. Arctic Cat Inc.*, No. 15-4475, 2017 WL 1180426, at *1 (D. Minn. Mar. 29, 2017). In 2013, Arctic Cat introduced a competing product—the Wildcat Trail—which allegedly reduced Polaris's market share by 10%. *Id.* In response, Polaris filed five separate patent infringement actions—two of which are the instant cases. *Id.* at *1-2. Specifically, Polaris alleged infringement of Claim 1 of the '449 Patent in November 2015 (Case No. 15-4129) and infringement of Claims 1, 10, and 11 of the '501 Patent in December 2015 (Case No. 15-4475). *Id.* at *2.

The patents at issue are discussed briefly here. Because of the number of summary judgment motions discussed in this opinion, facts relevant to each motion will be discussed in the analysis section for those motions.

Claim 1 of the '449 Patent states:

> A vehicle, comprising: . . . . a generally U-shaped sway bar having a first end portion coupled to the first suspension, a second end portion coupled to the second suspension, and a middle portion supported by the frame, the first end portion and the second end portion are longitudinally positioned between the seating and the middle portion, the generally U-shaped sway bar being rotatably coupled to the frame and the middle portion is a continuous section which extends across a central longitudinal plane of the vehicle and **the middle portion is positioned rearward of a rear end of the frame**, wherein the

> first shock and the second shock are **spaced apart from an interior region of the generally U-shaped sway bar**.

(Decl. of Joseph A. Herriges in Supp. of Def.'s Opening Claim Construction Brief ("Herriges Decl."), Ex. A at 44, Mar. 31, 2017, Case No. 15-4475, Docket No. 137 (emphasis added).)

Claims 1 of the '501 Patent states:

> A vehicle comprising: . . . . an air intake system operatively coupled to the CVT [transmission] unit **to communicate ambient air to an interior of the CVT [transmission] unit**, the air intake system receiving ambient air through an 45 inlet in a portion of the plurality of exterior body panels, the inlet in the portion of the plurality of exterior body panels being located rearward of the first wheel of the first ground engaging member and forward of the second wheel of the second ground engaging member and 50 located laterally outside of a lateral extent of the power source and the CVT unit.

(Herriges Decl., Ex. B at 111 (emphasis added).) Claim 10 states:

> The vehicle of claim 9, further comprising: a second air intake system operatively coupled to the internal combustion **engine to communicate ambient air to the internal combustion engine** for combustion of the fuel, the second air intake system including a second air inlet in the plurality of exterior body panels through which ambient air enters the second air intake system, the second air intake system includes an airbox located rearward of the drive member of the CVT unit and below the cargo carrying portion, the airbox includes a base portion and a cover, the cover of the airbox is locate rearward of the base portion of the airbox, a filter is positioned in an interior of the airbox, the cover is removably coupled to the base portion to permit access to the filter.

(*Id.* (emphasis added).) And Claim 11 provides:

> The vehicle of claim 10, wherein the air inlet and the second air inlet are located rearward of **a center of gravity of the vehicle**.

(*Id.* at 112 (emphasis added).)

The Court issued an Order Construing Claim Terms on December 14, 2017 for both the '449 Patent and the '501 Patent. (Mem. Op. and Order Construing Claim Terms, Dec. 14, 2017, Case No. 15-4129, Docket No. 97, Case No. 15-4475, Docket No. 192.) In that Order, the Court construed the disputed claim terms as follows:

| Term | Construction |
|---|---|
| '449 Patent<br>[Claim 1]<br>"the middle portion is positioned rearward of a rear end of the frame" | "the middle of the sway bar is rearward of the rear end of the frame where the middle portion is positioned on the frame" |
| '449 Patent<br>[Claim 1]<br>"spaced apart from an interior region of the generally U-shaped sway bar" | "when viewed from above, located outside an area defined by the interior region of the generally U-shaped sway bar" |
| '501 Patent<br>[Claims 1, 10]<br>"communicate ambient air to an interior of" the transmission or engine | Plain and ordinary meaning |
| '501 Patent<br>[Claim 11]<br>"a center of gravity of the vehicle" | Plain and ordinary meaning |

**DISCUSSION**

## I. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      Exclusion of Expert Testimony**

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be **useful** to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be **qualified** to assist the finder of fact. Third, the proposed evidence must be **reliable or trustworthy** in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (emphasis added) (cleaned up). The Court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

Rule 702 requires that an expert possess "knowledge, skill, experience, training, or education sufficient to assist the trier of fact ." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal quotations omitted). But this requirement is

"satisfied where expert testimony advances the trier of fact's understanding to **any** degree," and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Id.* (internal quotations omitted) (emphasis added). "Although the factual basis of an expert's opinion is generally an issue of credibility rather than admissibility, an expert's opinion should be excluded if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

Ultimately, the Court "should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Robinson*, 447 F. 3d at 1100 (quoting *Daubert*, 509 U.S. at 595). Nevertheless, overly speculative testimony should not be admitted, and the Court should not admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## II.    THE '449 PATENT

### A.  Construction of "Interior Region"

The Court directed both parties to submit supplemental briefings on the definition of the term "interior region" as it is used in the Court's prior construction of the '449 Patent, "when viewed from above, located outside an area defined by the interior region of the generally U-shaped sway bar." (Briefing Order, Nov. 15, 2018, Case No. 15-4129, Docket

No. 270.)  Both parties submitted briefs.  (Pl.'s Brief on Interior Region, Nov. 29, 2018, Case No. 15-4129, Docket No. 275; Def.'s Brief on Interior Region, Nov. 29, 2018, Case No. 15-4129, Docket No. 279.)

### 1.    Claim Construction Principles

Claim construction is a question of law for the Court.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1344 (Fed. Cir. 2002).  Claim terms are given their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  To ascertain this meaning and define the scope of the invention, courts look to the words of the claims themselves, the specification, and the prosecution history of the patent.  *Id.* at 1314; *see also Masco Corp. v. United States*, 303 F.3d 1316, 1324 (Fed. Cir. 2002); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  The context of the surrounding words of the claim term may be instructive on the ordinary and customary meaning of the term.  *Id.* (citing *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

Claims do not stand alone, but are part of "a fully integrated written instrument," which includes the specification.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed Cir. 1995).  The specification is the single best guide to the meaning of a disputed term, and "claims 'must be read in view of the specification, of which they are a part.'"  *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979); *see also Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis.

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). Courts, however, will not import a limitation from the specification into the claims. *Phillips*, 415 F.3d at 1320. The Federal Circuit has "repeatedly warned against confining the claims to . . . embodiments" described in the specification. *Id.* at 1323; *cf. id.* (holding that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

In addition to considering the specification, the Court may also consider the patent's prosecution history, which is considered "intrinsic evidence." *Id.* at 1317. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* The prosecution history, however, "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* But the prosecution history may still "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Although intrinsic evidence is of primary importance in construing a patent's claim terms, the Court may also rely on extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Extrinsic evidence is less significant than intrinsic evidence in construing claim terms, and extrinsic evidence cannot

establish a meaning of the claim term that is at odds with the intrinsic evidence. *Phillips*, 415 F.3d at 1317-18.

### 2. Claim Construction

### a. Claim Language

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Polaris argues the plain and ordinary meaning should apply. The parties, however, disagree about the meaning of "interior region;" thus, the plain and ordinary meaning is inadequate and must be construed.

### b. Specification

The specification for the '449 Patent references the "interior region" of the sway bar only once in Figure 20, reproduced below with color added. The sway bar is depicted in red, the shocks in green, and the interior region of the sway bar in blue.



(Def.'s Brief on Interior Region at 5.)

The specification limits the interior region to a two-dimensional plane. A specification, however, should not be interpreted to limit the claims of a patent.

### c. Prosecution History

Polaris's original claim language described "a sway bar coupled to the first suspension member and the second suspension member, the sway bar supported by the frame at a location rearward of the first drive unit." (App. for Claim Construction at 122, Mar. 31, 2017, Case No. 15-4129, Docket No. 52.) The Patent Office rejected this claim in view of a prior art, the Brady patent—a patent for an all-terrain vehicle. In response to the rejection, Polaris changed its claim to

> a generally U-shaped sway bar having a first end portion coupled to the first suspension member, a second end portion coupled to [[and]] the second suspension member, the sway bar, and a middle portion supported by the frame, the generally U-shaped sway bar being rotatably coupled to the frame and the middle portion is a continuous section which extends across a central longitudinal plane of the vehicle and having a rear portion and the middle portion is positioned rearward of a rear end of the frame, wherein the first shock and the second shock are spaced apart from an interior region of the generally U-shaped sway bar at a first height, the first height being completely above the rear drive unit.

(*Id.* at 175-76.) Polaris added the language regarding the spatial relationship between the shocks and the interior region of the sway bar to distinguish the '449 Patent from the Brady Patent because the shocks in the Brady patent passed through the interior region of the sway bar, as depicted below.

-10-



(Pl.'s Brief on Interior Region at 9.)

Polaris further clarified in a new claim, that "the generally U-shaped sway bar is completely rearward of the first shock and the second shock." (*Id.* at 178.) This clarification indicates that the interior region is more than simply the three-dimensional space bounded by the height, width, and length of the sway bar, otherwise Polaris would have no need to clarify that the sway bar is completely reward of the shocks to show the "spaced apart from an interior region" relationship. A configuration such as the one from Arctic Cat's allegedly infringing vehicles where the shocks extend into the air space above the interior of the sway bar would presumably satisfy the "spaced apart" language, but not the "completely rearward" language.

### d.    Other Evidence

Polaris points to evidence that certain Arctic Cat experts and fact witnesses agree with Polaris's definition of "interior region," however, this evidence is insufficient to surmount the prosecution history showing that Polaris meant for the shocks to be completely outside of an interior region that extends upward and downward further than merely the height of the sway bar.

The Court holds that the meaning of "interior region" is a columnar space that takes the shape of the space bounded by the sway bar and extends upward to the lowest height of the cargo bed and downward to the lowest height of the of the ground engaging members.

### B.    Infringement

Infringement is a question of fact. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011). As such, a grant of summary judgment of noninfringement is proper when no reasonable factfinder could find that the accused product contains every claim limitation or its equivalent. *PC Connector Sols., LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005). The shocks on the allegedly infringing Arctic Cat vehicles pass through the interior region of the sway bar. Thus, the shocks are not set apart from the interior region of the sway bar and do not infringe on the '449 Patent. The Court will grant Arctic Cat's motion for noninfringement of the '449 Patent.

## III.   INFRINGEMENT OF THE '501 PATENT

Polaris moved for summary judgment of its claim for infringement of the '501 Patent.  Whether Arctic Cat infringed is a factual question, but the Court may grant summary judgment of infringement if it concludes that no genuine issue of fact remains.[1] Arctic Cat stipulated that its vehicles infringed the '501 Patent.  (Stipulation at 2, June 29, 2018, Case No. 15-4475, Docket No. 298.)  Thus, no dispute of material fact remains so the Court will grant Polaris's motion for summary judgment as to infringement of the '501 Patent.

## IV.   EXCLUSION OF NANTELL LOST PROFITS TESTIMONY

Nantell's expert report offers his opinion about Polaris's lost profits.  Polaris makes a claim for lost profits, not of itself, but of its wholly owned subsidiary, Polaris Sales Inc. ("PSI").  Polaris argues that it manufactures vehicles and transfers those vehicles to PSI who in turn sells them to third-party dealers.  Artic Cat contends that Polaris actually sells the vehicles to PSI.  Nantell's report details why he thinks PSI's profits inexorably flow to Polaris, and how much lost profits PSI (or Polaris) has suffered because of Arctic Cat's actions.

---

[1] *See Bombardier Recreational Prods., Inc. et al. v. Arctic Cat Inc. and Arctic Cat Sales Inc.*, 12-2706 (JRT/LIB), Docket No. 781 at 14, 31 (D. Minn. Dec. 29, 2016); *Solutran, Inc. v. U.S. Bancorp & Elavon, Inc.*, 13-2637 (SRN/BRT), 2017 U.S. Dist. LEXIS 194336, at *11 (D. Minn. Nov. 27, 2017); *August Tech. Corp. v. Camtek Ltd.*, 05-1396 (JRT/FLN), 2014 U.S. Dist. LEXIS 182116, at *51 (D. Minn. Mar. 31, 2014); *3M Company v. Mohan*, 09-1413 (ADM/FLN), 2010 U.S. Dist. LEXIS 81094, at *8 (D. Minn. Aug. 9, 2010).

Arctic Cat argues that under Federal Rule of Evidence 702, an expert's conclusory statements are inadmissible unless they are properly grounded in facts. Arctic Cat cites several cases to support this argument. In *EZ Dock, Inc. v. Schafer Sys., Inc.*, the court excluded an expert opinion that "points to *no* facts that underlie his proposed testimony regarding either the demand for the patented product, the availability of non-infringing alternatives, or the nature of the market as a two-supplier market." No. 98-2364 (RHK/AJB), 2003 WL 1610781 at *6 (D. Minn. Mar. 8, 2003) (emphasis in original). In *Kapps v. Biosense Webster, Inc.*, the court held that "an expert witness must reliably connect his opinion to the underlying data," and where "[n]othing but [the expert's] say-so (his *ipse dixit*) connects the smear on the outside of the catheter to the catheter's failure . . . 'there is simply too great an analytical gap' between [the expert's] opinion and the underlying facts" to permit the expert to testify as such. 813 F.Supp.2d 1128, 1149 (D. Minn. 2011) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)); *see also In re Baycol Products Litigation*, 532 F.Supp.2d 1029, 1036 (D. Minn. 2007) (holding that a court need not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert).

Prior to this summary judgment motion, Arctic Cat moved to strike Polaris's claim for lost profits based on an inexorable flow theory. In the Court's Memorandum Opinion and Order on the motion to strike, the Court set its expectations of the parties. (Mem. Op. and Order on Mot. to Compel at 7, July 3, 2018, Case No. 15-4475, Docket No. 299.) The Court directed that "Polaris cannot rely merely on its ownership and control of PSI (or on PSI's tax status) to prove that PSI's profits flow inexorably to Polaris. Additionally, any

expert opinion that PSI's profits flow inexorably to Polaris must be based on more than Polaris's ownership and control of PSI." (*Id.* at 8 (citation omitted).)

Arctic Cat argues that Nantell should be precluded from testifying as to two of his opinions. First, it argues that Nantell's opinion on whether an inexorable flow of profits exists from PSI to Polaris should be excluded. Second, it argues that Nantell's opinion on the amount of lost profits Polaris sustained should be excluded.

Arctic Cat argues that four sentences are unsupported by facts including:

- "Based on my review of Polaris's materials, Polaris functions essentially as one, fully-integrated company."
- "Polaris's revenues expenses, profits, assets and liabilities are determined by rolling up the financials of PSI into the parent, i.e. Polaris."
- "[A]ny economic impact on PSI from Arctic Cat's infringement would be fully experienced by Polaris."
- "The sales to customers would be sustained by the vertically integrated company, including Polaris at the parent level."

(Decl. of Maria Elena Stiteler ("Stiteler Decl.") ¶ 3, Ex. B ("Nantell Report") ¶ 20, July 20, 2018, Case No. 15-4475, Docket Nos. 338, 340.)

Arctic Cat argues that these sentences are not supported by any citations.

Arctic Cat also argues that only one produced document directly speaks to the relationship between Polaris and PSI. A Marketing and Distribution Agreement ("Agreement") between Polaris and PSI establishes that PSI is "an independent contractor, and not an agent, employee, partner, or joint venturer," of Polaris. (Stiteler Decl. ¶ 2, Ex. A ¶ 12.) Arctic Cat argues that this directly contradicts Nantell's claim that Polaris functions essentially as a fully-integrated company.

With its Memorandum in Opposition to this motion, Polaris submitted two declarations, one by the Chief Financial Officer of Polaris's Off-Road Vehicle Segment,

William Au-Yeung, and the other by Nantell. Nantell's Declaration clarifies that his opinion on the flow of profits from PSI to Polaris was based on his review of Polaris's materials, "inclusive of Polaris's financial-reporting arrangement, which [he] discussed at length with Mr. William Au-Yeung." (Decl. of Dr. Timothy J. Nantell ¶ 5, Aug. 16, 2018, Case No. 15-4475, Docket No. 397.) Nantell also states that "I further made reference in Paragraph 20 to the 'review of Polaris's materials' because it is important that my conclusions are consistent with the totality of evidence I review." (*Id.* ¶ 6.) So although Nantell did not cite to specific evidence, his opinion is supported by the materials he reviewed and named in his Declaration.

Arctic Cat urges the Court not to consider Nantell's Declaration because it is an untimely expert supplementation. In *Kruszka v. Novartis Pharm. Corp.*, the court refused to permit an expert witness to testify to information provided only in a post-report declaration submitted by the expert, reasoning that the declaration was "improper and untimely." 28 F.Supp.3d 920, 928 (D. Minn. 2014). Nantell's Declaration, however, is dissimilar from the one in that case, because although Nantell did not specifically cite to his interview with Au-Yeung in his report, Au-Yeung was listed as a source in the original report and paragraph 20 of the report contained references to the entirety of materials reviewed by Nantell. In his report, Nantell simply balanced his citation of the facts with the need to make the report accessible.

Arctic Cat's arguments go to the weight of the expert's evidence and not its admissibility. Thus, the Court will deny Arctic Cat's motion to exclude certain testimony of Nantell.

## V.    NO LOST PROFITS OF THE '501 PATENT

Arctic Cat moves the Court for summary judgment of no lost profits of the '501 Patent.  Polaris claims lost profits for its wholly owned subsidiary PSI.  Arctic Cat argues that Polaris failed to show that profits inexorably flowed from PSI to Polaris, and thus, Polaris's lost profits claim fails.  Courts generally allow patentees to claim lost profits where "a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1379 (Fed. Cir. 2015) (quoting *Ericsson Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2004)).  Thus, "the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits." *Poly–Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004).  Typically, "a patentee may not claim, as its own damages, the lost profits of a related company." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375 (Fed. Cir. 2015), *vacated on other grounds sub nom. Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 136 S.Ct. 893 (2016).  However, "[i]t is true that the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device." *Poly-Am.*, 383 F.3d at 1311.  Where a patentee claims the lost profits of a related entity as its own, the patentee must show that the lost profits of its related entity inexorably flow to and become the lost profits of the patentee.  *See id.*

Showing inexorable flow of profits from one entity to another is an extremely high bar to meet.  For instance, a patentee sharing the same sole owner, president, and CEO as the company selling the patented products, and where the owner had complete control of

any profits, may be insufficient on its own to establish inexorable flow. *Kowalski v. Mommy Gina Tuna Resources*, 574 F.Supp.2d 1160, 1163 (D. Haw. 2008). Further, a patentee with a non-exclusive licensing arrangement with its formerly wholly-owned subsidiary is insufficient. *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1365 (Fed. Cir. 2008) (recalled and amended on other grounds). Additionally, a patentee who wholly owns two S corporations that produce a patented product and who files his personal income taxes to include the S corporations is insufficient. *Schwendimann v. Arkwright Advanced Coating, Inc.*, 220 F.Supp.3d at 974 (D. Minn. 2016).

Here, William Au-Yeung, in his Declaration, attests that Polaris's Off-Road Vehicle Segment and PSI share a bank account wherein PSI deposits proceeds from its sales of Polaris vehicles. (Declaration of William Au-Yeung ¶ 5, 6, Aug. 16, 2018, Case No. 15-4475, Docket No. 382.) The revenue received remains under Polaris's control. (*Id.* ¶ 5.) All PSI costs related to sales of Polaris vehicles, such as employee expenses, are borne by Polaris. (*Id.* ¶ 6.) "There are no revenue, costs, or profits that are received or incurred by PSI, which are not recorded and accounted for by Polaris. Consequently, Polaris is structured so that all profits relating to [Polaris vehicles] are accounted for and banked at Polaris." (*Id.* ¶ 8.) Au-Yeung further states that he has worked at Polaris since 2012, and the above processes have been in place since before he began working at Polaris, showing a historical practice of profit flow from PSI to Polaris. (*Id.* ¶ 2, 12.)

Despite the high bar of showing inexorable flow of profits, Polaris has shown facts sufficient to deny summary judgment on this claim. Polaris shows a history of inexorable flow of profits, and a structural relationship—a shared bank account—demonstrating

inexorable flow of profits. Thus, the Court will deny Arctic Cat's motion for summary judgment as to lost profits.

## VI.    INVALIDITY DEFENSE BASED ON KYMCO VEHICLE

Arctic Cat asserts that the '501 Patent is invalid due to a prior art: a vehicle manufactured by Kymco, the Kymco UXV 500. (Declaration of Peter Kohlhepp ("Kohlhepp Decl.") ¶ 3, Ex. 2 at 75, July 20, 2018, Case No. 15-4475, Docket No. 350.) The priority date for the '501 Patent is August 3, 2010. (Pl.'s Mem. in Supp. of Summ. J. for Invalidity at 5, July 20, 2018, Case No. 15-4475, Docket No. 346.) Arctic Cat asserted, based on an Owner's Manual, that the Kymco UXV 500 was configured before the priority date, and that the Kymco UXV 500's use of continuously variable transmission ("CVT") engine intake inlets located in the side of the cargo box invalidated the '501 Patent. (Kohlhepp Decl. ¶ 4, Ex. 3 at 91, 108-109.) In May 2017 Arctic Cat acquired a vehicle that it asserts is a physical embodiment of the Kymco UXV 500 (the physical embodiment vehicle will be referred to as "2009 Vehicle"). (*Id.* ¶ 12, Ex. 11 at 2, July 20, 2018, Docket No. 352.) Arctic Cat purchased the 2009 Vehicle from Powerhouse Motorsports in Utah. (*Id.* ¶ 8, Ex. 7, July 20, 2018, Docket No. 351.) Previously, it had been owned by a person named Erin Hendricks, and before that Powerhouse Motorsports owned the brand new 2009 Vehicle that it sold to Hendricks. (*Id.* ¶¶ 10-11, Exs. 9-10.)

In March 2018, Arctic Cat served an expert report by Dr. Greg Davis on Polaris in which Davis relied on the 2009 Vehicle for some parts of the report. The report, however, contradicted some of the initial claims Arctic Cat made based on the Owner's Manual. Specifically, Davis stated in the report that the CVT "collects air from a baffle box located

behind the driver's seat, a few inches from the side of the vehicle," as opposed to the side of the cargo box as Arctic Cat previously asserted. (*Id.* ¶ 13, Ex. 12 at 27, July 20, 2018, Docket No. 353.) Further, another intake inlet was located in the passenger compartment between the passenger and driver, and not in the side of the cargo box. (*Id* at 28.)

Polaris moves for summary judgment on whether the 2009 Vehicle itself is admissible evidence to be used as prior art to support Arctic Cat's invalidity defense. Polaris argues that regardless of whether the 2009 Vehicle qualifies as prior art, Arctic Cat failed to authentic the 2009 Vehicle by failing to put forth someone with personal knowledge to testify as to whether the 2009 Vehicle purchased in 2017 is in materially the same condition as it was in 2008.

Polaris argues that Arctic Cat must show that the 2009 Vehicle was in public use or on sale prior to the priority, August 3, 2010, and in materially the same configuration and condition that Arctic Cat obtained in 2017.[2] Polaris notes that Arctic Cat fails to provide the following evidence to authenticate the 2009 Vehicle:

---

[2] *See Navico Inc. v. Garmin Int'l*, 2:16-CV-00190-JRG-RSP, 2017 U.S. Dist. LEXIS 139806, at *10-12 (E.D. Tex. July 28, 2017) (granting a plaintiff's motion for summary judgment that a product did not qualify as prior art under Section 102 and finding evidence of a purchase order and that the purchaser listed the product in its depreciation schedule to be insufficient to defeat summary judgment because the defendant failed to show no relevant differences existed between the system described by a manual and the system that was listed on the purchase order and depreciation schedule.) (adopted by *Navico Inc. v. Garming Int'l, Inc.*, 2017 U.S. Dist. LEXIS 141147, at *2 (E.D. Tex. Aug. 31, 2017).

- "[P]hotographs showing the configuration of the material aspects of the [2009 Vehicle] back before the 2010 priority date." (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. on Kymco Vehicle at 12, July 20, 2018, Case No. 15-4475, Docket No. 346.)
- "[E]vidence that the [2009 Vehicle] ostensibly purchased by Erin Hendricks in 2009 was not altered in a material way prior to Arctic's purchase of it in 2017." (*Id.*)

Arctic Cat responds by arguing that its expert inspected the 2009 Vehicle and found that it was in materially the same condition now as it was before the priority date. To support this, Arctic Cat cites to several paragraphs in Dr. Greg Davis's expert report where he compared the Owner's or Service Manuals of the Kymco UXV 500 to the 2009 Vehicle and concluded that the items compared were the same. (Decl. of Joseph A. Herriges in Opp. to Mot. for Partial Summ. J. on Kymco Vehicle ¶ 2, Aug. 16, 2018, Docket No. 361, Ex. A ¶¶ 491, 494, 500, 509, 510, 527, 528, 533, 537, 542-44, 547, Docket No. 361-1.)

Polaris disputes this by arguing that Davis's reliance on the Manuals, and his comparison to the Manuals to authenticate the 2009 Vehicle is insufficient to defeat summary judgment. Polaris's arguments, however, go to the weight of the evidence. Arctic Cat has provided sufficient evidence to create a genuine dispute of material facts. Thus, the Court will deny Polaris's motion for summary judgment as to Arctic Cat's invalidity defense based on the Kymco vehicle.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment of noninfringement of the '449 Patent [Case No. 15-4129, Docket No. 203; Case No. 15-4475, Docket No. 307] is **GRANTED**.

2. Plaintiff's Motion for Summary Judgment of infringement of the '501 Patent [Case No. 15-4475, Docket No. 310] is **GRANTED**.

3. Defendants' Motions for Summary Judgment of no lost profits of the '501 Patent and to Exclude Expert Testimony [Case No. 15-4475, Docket No. 335] is **DENIED**.

4. Plaintiff's Motion for Partial Summary Judgment regarding Arctic Cat's invalidity defense based on the Kymco vehicle [Case No. 15-4475, Docket No. 343] is **DENIED**.

DATED: March 11, 2019        _____s/John R. Tunheim_____
at Minneapolis, Minnesota.        JOHN R. TUNHEIM
       Chief Judge
       United States District Court